United States District Court – District Of Massachusetts
1 Courthouse Way
Boston, Massachusetts 02210

Attachment 1

Laurence Brown,
pro se Plaintiff

     v.

Christopher Delmonte and
Brockton District Court,
Defendants

Civil Action

NO._____

# COMPLAINT

### Parties

1.   The Plaintiff, Laurence Brown, resides in Bridgewater, Plymouth County, Massachusetts.

2.   The Defendant, Chief Delmonte, and the Bridgewater Police Department, are located in Bridgewater, Plymouth County, Massachusetts.

3.   The Defendant, Brockton District Court, is located in Brockton, Plymouth County, Massachusetts.

### Jurisdiction

4.   This court has jurisdiction over this matter pursuant to 28 U.S.C. §1331.

## Allegations - Statement Of Facts

### The Plaintiff

5.    The Plaintiff is a law abiding retired senior citizen. He

has never been convicted of a crime. A search of the MA

Department of Criminal Justice Information Services indicates

that he has "no adult criminal court appearances". Additionally,

he voluntarily requested that the FBI perform an extensive

background investigation on him. After a 6 month investigation

the FBI stated that he "is a person whose criminal history

contains no firearm prohibitions". Please see exhibits section

on pages 45 - 47.

6.    In 2011, the Plaintiff applied for renewal of his license

to carry firearms (LTC). Defendant Delmonte, the new police

chief of the town of Bridgewater, denied the application in a

letter dated September 27, 2011, finding the Plaintiff to be "an

unsuitable person" to continue to hold his LTC. Please see

exhibits section on page 44.

7.    On December 16, 2011 at a hearing held in Brockton District

Court concerning this issue Delmonte stipulated on the record

that Plaintiff had never been convicted of a crime, that he does

not have any disqualifiers on his record, and that he would be

eligible to obtain a Firearms Identification Card.

8.    The Plaintiff has been involved in most of the shooting

sports, except hunting, for 54 continuous years. He became a NRA

certified instructor and obtained a Certificate Of Competency with firearms from the Commonwealth of Massachusetts in 1962 and has been considered somewhat of an expert in the area of firearms since that time. He shoots handgun, shotgun, and rifle each week. Using the words of the United States Court of Appeals for the Third Circuit in United States v. Barton, 633 F.3d 174 (3d Cir. 2011) the Plaintiff is "no more dangerous than a typical law-abiding citizen".

## Massachusetts Firearms licensing Law

9.    In Massachusetts, in order to possess and carry firearms you must be licensed. The licensing process has two parts. In the first part records are examined to find out whether the applicant is categorically prevented from possessing firearms because of a criminal record or a record of mental illness. The second part is a case by case discretionary review. Each individual applicant must be a suitable person according to the beliefs and prejudices of his or her police chief. This means a possible 351 different licensing requirements. (Plaintiff could have his license renewed if he moved, for example, to Brockton, West Bridgewater, East Bridgewater, Plymouth, Avon, or Rockland. However, the Plaintiff has resided in Bridgewater for 11 years and does not want to move.) *Please see page 41 - 42 for additional information.* It's actually worse then this because each town's requirements can change with a change in police

3

chief. That's what happened in this case, an experienced police chief (38 years experience, ten years as chief) issued the Plaintiff a license but an inexperienced police chief (first few months as chief) refused to renew it. Moving your residence from one town to another can be a nightmare for Massachusetts firearms owners. Different licensing requirements in different towns appears to violate the equal protection (equal justice) clause of the Fourteenth Amendment as well as the Second Amendment.

10.    Furthermore, Massachusetts has three types of licenses, a class A license to carry, a class B license to carry, and a firearms identification card (FID card), each type has different restrictions but the same qualifications. This is another case by case discretionary review by the police chief. Only the class A license to carry allows the license holder the ability to fully utilize his or her Second Amendment rights. *Please see page 43 for additional information.* Since all license applicants are subject to the same Second Amendment rights and categorical restrictions on licensing, and only the class A license to carry allows the license holder the ability to fully utilize his or her Second Amendment rights, having three types of license is unconstitutional under the Second Amendment and maybe also the fourteenth. Clearly, there are not three types of citizens, each

with different Constitutional rights and categorical restrictions on licensing.

11.    Clearly, Massachusetts's discretionary firearms licensing laws subject license applicants to severe restrictions on their Constitutional rights without providing any actual benefits to public safety. It's all an illusion.

12.    Discretion means judging on one's own, subjective. Subjective means "proceeding from or taking place within an individual's mind *such as to be unaffected by the external world, existing only in the mind; illusory*". The Plaintiff believes that the above definitions captures the essence of Massachusetts's discretionary firearms licensing law.

13.    The standard to reverse a police chief's charge of unsuitability "revocation of a license to carry firearms based on lack of suitability will be upheld unless the license holder demonstrates that revocation was 'arbitrary, capricious, or an abuse of discretion" is impossible to meet. It's proving yourself innocent beyond any doubt.

Federal Court Rulings Clarifying The Second Amendment

14.    After some initial confusion as to how to handle Second Amendment cases, the federal court system has reached a consensus.

## DISTRICT OF COLUMBIA ET AL. *v.* HELLER
## U.S. SUPREME COURT

15.    There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms.

16.    the right secured...was by the time of the founding understood to be an individual right protecting against both public and private violence.

17.    The Second Amendment protects an individual right to possess a firearm unconnected with service in a militia, and to use that arm for traditionally lawful purposes, such as self-defense within the home.

18.    The handgun ban... violate the Second Amendment. The District's total ban on handgun possession in the home amounts to a prohibition on an entire class of "arms" that Americans overwhelmingly choose for the lawful purpose of self-defense. Under any of the standards of scrutiny the Court has applied to enumerated constitutional rights, this prohibition—in the place where the importance of the lawful defense of self, family, and property is most acute—would fail constitutional muster. ... and is hence unconstitutional.

19.    In *Muscarello* v. *United States*, 524 U. S. 125 (1998), in the course of analyzing the meaning of "carries a firearm" in a federal criminal statute, JUSTICE GINSBURG wrote that "[s]urely

a most familiar meaning is, as the Constitution's Second
Amendment . . . indicate[s]: 'wear, bear, or carry . . . upon
the person or in the clothing or in a pocket, for the purpose .
. . of being armed and ready for offensive or defensive action
in a case of conflict with another person. We think that JUSTICE
GINSBURG accurately captured the natural meaning of "bear arms".
20.    Meaning of the Operative Clause. Putting all of these
textual elements together, we find that they guarantee the
individual right to possess and carry weapons in case of
confrontation.

21.    As the quotations earlier in this opinion demonstrate, the
inherent right of self-defense has been central to the Second
Amendment right. The handgun ban amounts to a prohibition of an
entire class of "arms" that is overwhelmingly chosen by American
society for that lawful purpose. The prohibition extends,
moreover, to the home, where the need for defense of self,
family, and property is most acute. Under any of the standards
of scrutiny that we have applied to enumerated constitutional
rights, banning from the home "the most preferred firearm in the
nation to 'keep' and use for protection of one's home and
family," would fail constitutional muster.

22.    ("A statute which, under the pretence of regulating,
amounts to a destruction of the right, or which requires arms to
be so borne as to render them wholly useless for the purpose of

7

defense, would be clearly unconstitutional").It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon.

23.    Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.

24.    We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad. We would not apply an "interest-balancing" approach to the prohibition of a peaceful neo-Nazi march through Skokie. The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and

8

disclosure of state secrets, but not for the expression of extremely unpopular and wrong-headed views. The Second Amendment is no different. Like the First, it is the very *product* of an interest-balancing by the people—which JUSTICE BREYER would now conduct for them anew. And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.

25.    If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant...

26.    In sum, we hold that the District's ban on handgun possession in the home violates the Second Amendment...

27.    But the enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of handguns held and used for self-defense in the home.

## ILLINOIS ASSOCIATION OF FIREARMS RETAILERS v. CITY OF CHICAGO U. S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

28.    certain fundamental rights are protected by the Constitution, put outside government's reach, including the right to keep and bear arms for self-defense under the Second Amendment.

29.   *Moore* reiterates that the level of scrutiny during the
second-step means-end analysis varies according to the breadth
of the challenged Second Amendment restriction

30.   the State needed to make an extremely strong showing that
its law furthered public safety.

31.   so substantial a curtailment of the right of armed self-
defense requires a greater showing of justification than merely
that the public *might* benefit on balance from such a
curtailment, though there is no proof it would.

32.   *Moore* reasoned that the State had to make a stronger
empirical showing that its gun ban was vital to public safety
than the federal government had to in *United States v. Skoien*,
614 F.3d 638 (7th Cir. 2010) (en banc). There, the government
successfully justified a federal law that forbids convicted
domestic-violence misdemeanants from possessing firearms. *Id.* at
639, 645.

33.   To carry its burden, the City must establish a "close fit"
between the sales-and-transfer ban and the actual public
interests it serves, and prove that the public's interests are
strong enough to justify "so substantial an encumbrance on
individual Second Amendment rights.

## MICHAEL MOORE, *ET. AL.*, and MARY E. SHEPARD, *et al.* v. LISA MADIGAN, ATT. GEN. OF ILL., *et al.* U. S. Court Of Appeals For The Seventh Circuit

34.   The appellees ask us to repudiate the Court's historical
analysis. That we can't do. Nor can we ignore the implication of

the analysis that the constitutional right of armed self-defense is broader than the right to have a gun in one's home.

35. *Heller* repeatedly invokes a broader Second Amendment right than the right to have a gun in one's home, as when it says that the amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." 554 U.S. at 592. Confrontations are not limited to the home.

36. The Second Amendment states in its entirety that "a well regulated Militia, being necessary to the security of a free State, the right of the people to keep *and bear* Arms, shall not be infringed" (emphasis added). The right to "bear" as distinct from the right to "keep" arms is unlikely to refer to the home. To speak of "bearing" arms within one's home would at all times have been an awkward usage. A right to bear arms thus implies a right to carry a loaded gun outside the home.

37. To confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*.

38. The available data about permit holders also imply that they are at fairly low risk of misusing guns, consistent with the relatively low arrest rates observed to date for permit holders. Based on available empirical data, therefore, we expect relatively little public safety impact

39. Moreover, violent crime in the United States has been falling for many years...

11

www.themonkeycage.org/blog/2012/07/21/thedeclining-

culture-of-guns-and-violence-in-the-unitedstates (visited Oct.

29, 2012); see also Tom W. Smith, "Public Attitudes Towards the

Regulation of Firearms" (University of Chicago Nat'l Opinion

Research Center , Mar. 2007),http://icpgv.org/pdf/NOR

CPoll.pdf(visited Oct.29,2012)—in the same period in which gun

laws have become more permissive.

40.    Anyway the Supreme Court made clear in *Heller* that it

wasn't going to make the right to bear arms depend on casualty

counts.

41.    In *Skoien* we said that the government had to make a

"strong showing" that a gun ban was vital to public safety—it

was not enough that the ban was "rational." 614 F.3d

42.    A blanket prohibition on carrying gun in public prevents a

person from defending himself anywhere except inside his home;

and so substantial a curtailment of the right of armed self-

defense requires a greater showing of justification than merely

that the public *might* benefit on balance from such a

curtailment, though there is no proof it would.

## TOM G. PALMER ET. AL. v. DISTRICT OF COLUMBIA and CATHY LANIER U. S. DISTRICT COURT – DISTRICT OF COLUMBIA

43.    Furthermore, as the court in *Peruta* correctly pointed out,

"with *Heller* on the books, the Second Amendment's original

meaning is now settled in at least two relevant respects."

*Peruta*, 742 F.3d at 1155. "First, *Heller* clarifies that the

keeping and bearing of arms is, *and has always been*, an
individual right. *Id.* (citing [*Heller*], 554 U.S. at 616, 128 S.
Ct. 2783). "Second, the right is, *and has always been*, oriented
to the end of self-defense."

44.    After an exhaustive summary of the text and history of the
Second Amendment, the Ninth Circuit in *Peruta* concluded that
"the carrying of an operable handgun outside the home for the
lawful purpose of self-defense, though subject to traditional
restrictions, constitutes 'bear[ing] Arms' within the meaning of
the Second Amendment." *Peruta*, 742 F.3d at 1166. As the Ninth
Circuit noted, this conclusion is not surprising in light of the
fact that other circuits have reached the same result. *See id.*
(citing *Moore*, 702 F.3d at 936 ("A right to bear arms thus
implies a right to carry a loaded gun outside the home.");
*Drake*, 724 F.3d at 431 (recognizing that the Second Amendment
right "*may* have some application beyond the home"); *Woollard v.
Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013) ("We . . . assume
that the *Heller* right exists outside the home. . . .");
*Kachalsky*, 701 F.3d at 89 (assuming that the Second Amendment
"must have *some* application in the very different context of the
public possession of firearms")). This Court, joining with most
of the other courts that have addressed this issue, reaches this
same conclusion.

45.    Finally, as the *Peruta* court pointed out, "[understanding
the scope of the right is not just necessary, it is key to [the

court's] analysis [because,] if self-defense outside the home is part of the core right to 'bear arms' and the [District of Columbia's] regulatory scheme prohibits the exercise of that right, no amount of interest-balancing under a heightened form of means-end scrutiny can justify [the District of Columbia's] policy." *Id.* at 1167 (citing *Heller*, 554 U.S. at 634, 128 S. Ct. 2783 ("The very enumeration of the right takes out of the hands of government even the Third Branch of Government the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.")

46.  In light of *Heller, McDonald*, and their progeny, there is no longer any basis on which this Court can conclude that the District of Columbia's total ban on the public carrying of ready to use handguns outside the home is constitutional under any level of scrutiny.

47.  BELLEVUE, Wash., Nov. 7, 2014 /PRNewswire-USNewswire/ -- The U.S. District Court for the District of Columbia has denied a motion by the District to reconsider its ruling in the case of *Palmer v. District of Columbia*, a Second Amendment Foundation case that nullified the city's ban on carrying firearms outside of the home.

## EDWARD PERUTA ET. AL. v. COUNTY OF SAN DIEGO ET.AL. U. S. COURT OF APPEALS FOR THE NINTH CIRCUIT (also ADAM RICHARDS v. ED PRIETO)

48.  California law delegates to each city and county the power to issue a written policy setting forth the procedures for

**14**

obtaining a concealed-carry license. *Id.* §26160. San Diego
County has issued such a policy. At issue in this appeal is that
policy's interpretation of the "good cause" requirement....Good
cause is "evaluated on an individual basis"

49.    As in the district court, on appeal the applicants place
one argument at center stage: they assert that by defining "good
cause" in San Diego County's permitting scheme to exclude a
general desire to carry for self-defense, the County
impermissibly burdens their Second Amendment right to bear arms.

50.    *Heller* and *McDonald* Courts were hardly shy: we must
consult "both text and history." *Heller*, 554 U.S. at 595; *see
also McDonald*, 130 S. Ct. at 3047(reiterating that "the scope of
the Second Amendment right" is determined by historical analysis
and not interest balancing).

51.    The Second Amendment secures the right not only to "keep"
arms but also to "*bear*" them—the verb whose original meaning is
key in this case. Saving us the trouble of pulling the
eighteenth-century dictionaries ourselves, the Court already has
supplied the word's plain meaning: "At the time of the founding,
as now, to 'bear' meant to 'carry.'" *Heller*, 554 U.S. at 584.3
Yet, not "carry" in the ordinary sense of "convey[ing] or
transport[ing]" an object, as one might carry groceries to the
check-out counter or garments to the laundromat, but "carry for
a particular purpose—confrontation." *Id.* The "natural meaning of
'bear arms,'" according to the *Heller* majority, was best

15

articulated by Justice Ginsburg in her dissenting opinion in
*Muscarello v. United States*, 524 U.S. 125 (1998): to "'wear,
bear, or carry . . . upon the person or in the clothing or in a
pocket, for the purpose. . . of being armed and ready for
offensive or defensive action in a case of conflict with another
person.'"

52.    Speakers of the English language will all agree: "bearing
a weapon inside the home" does not exhaust this definition of
"carry." For one thing, the very risk occasioning such carriage,
"confrontation," is "not limited to the home." *Moore v. Madigan*,
702 F.3d 933, 936 (7th Cir. 2012). One needn't point to
statistics to recognize that the prospect of conflict—at least,
the sort of conflict for which one would wish to be "armed and
ready"—is just as menacing (and likely more so) beyond the front
porch as it is in the living room. For that reason, "[t]o speak
of 'bearing' arms within one's home would at all times have been
an awkward usage." *Id.* To be sure, the idea of carrying a gun
"in the clothing or in a pocket, for the purpose . . . of being
armed and ready," does not exactly conjure up images of father
stuffing a six-shooter in his pajama's pocket before heading
downstairs to start the morning's coffee, or mother concealing a
handgun in her coat before stepping outside to retrieve the
mail. Instead, it brings to mind scenes such as a woman toting a
small handgun in her purse as she walks through a dangerous
neighborhood, or a night-shift worker carrying a handgun in his

coat as he travels to and from his job site. More importantly, at the time of the Second Amendment's enactment, the familiar image that "bear arms" would have painted is one of an eighteenth-century frontiersman, who "from time to time [would] leave [his] home to obtain supplies from the nearest trading post, and en route one would be as much (probably more) at risk if unarmed as one would be in one's home unarmed." *Id.* at 936. Indeed, it was this spirit of the arms-bearing settler that Senator Charles Sumner invoked (and the *Heller* Court cited as instructive of the scope of the right) in the (in)famous "Crime against Kansas" speech in 1856: "The rifle has ever been the companion of the pioneer and, under God, his tutelary protector against the red man and the beast of the forest. Never was this efficient weapon more needed in just self-defense, than now in Kansas, and at least one article in our National Constitution must be blotted out, before the complete right to it can in any way be impeached." 4 *The Works of Charles Sumner* 211-12 (1875); *see also Heller*, 554 U.S. at 609. Other passages in *Heller* and *McDonald* suggest that the Court shares Sumner's view of the scope of the right. The Second Amendment, *Heller* tells us, secures "the right to 'protect oneself against both *public* and private violence, ' thus extending the right in some form to wherever a person could become exposed to public or private violence." *United States v. Masciandaro,* 638 F.3d 458, 467

53.    (4th Cir. 2011) (Niemeyer, J., specially concurring)
(quoting *Heller*, 554 U.S. at 594 (emphasis added)). The Court
reinforced this view by clarifying that the need for the right
is "most acute" in the home, *Heller*, 554 U.S. at 628, thus
implying that the right exists outside the home...

54.    both *Heller* and *McDonald* identify the "core component" of
the right as self-defense, which necessarily "take[s] place
wherever [a] person happens to be," whether in a back alley or
on the back deck.

55.    ("To confine the right to be armed to the home is to
divorce the Second Amendment from the right of self-defense
described in *Heller* and *McDonald*.").

56.    the Second Amendment right "could not rationally have been
limited to the home." *Moore*, 702 F.3d at 936. Though people may
"keep Arms" (or, per *Heller*'s definition, "have weapons," 554
U.S. at 582) in the home for defense of self, family, and
property, they are more sensibly said to "bear Arms" (or,
*Heller*'s gloss: "carry [weapons] . . . upon the person or in the
clothing or in a pocket," *id.* at 584) in *nondomestic* settings.4
*Kachalsky*, 701 F.3d at 89 n.10 ("The plain text of the Second
Amendment does not limit the right to bear arms to the home.");
*see also Drake v. Filko*, 724 F.3d 426, 444 (3d Cir.2013)
(Hardiman, J., dissenting) ("To speak of 'bearing' arms solely
within one's home not only would conflate 'bearing' with
'keeping,' in derogation of the Court's holding that the verbs

**18**

codified distinct rights, but also would be awkward usage given the meaning assigned the terms by the Supreme Court.").

57.    many of the same cases that the *Heller* majority invoked as proof that the Second Amendment secures an individual right may just as easily be cited for the proposition that the right to carry in case of confrontation means nothing if not the general right to carry a common weapon outside the home for self-defense.

58.    Our conclusion that the right to bear arms includes the right to carry an operable firearm outside the home for the lawful purpose of self-defense is perhaps unsurprising—other circuits faced with this question have expressly held, or at the very least have assumed, that this is so.

59.    "[C]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them. . . ." *Id.* at 634-35. A law that "under the pretence of regulating, amounts to a destruction of the right" would not pass constitutional muster "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Id.* at 628-29. Put simply, a law that destroys(rather than merely burdens) a right central to the Second Amendment must be struck down. *Id.*

60.    712 F.3d at 876; *Kachalsky*, 701 F.3d at 89; *cf. Masciandaro*, 638 F.3d at 475. Understanding the scope of the right is not just necessary, it is key to our analysis. For if self-defense outside the home is part of the core right to "bear

arms" and the California regulatory scheme prohibits the
exercise of that right, no amount of interest-balancing under a
heightened form of means-ends scrutiny can justify San Diego
County's policy. *See Heller*, 554 U.S. at 634 ("The very
enumeration of the right takes out of the hands of government—
even the Third Branch of Government—the power to decide on a
case-by-case basis whether the right is *really worth* insisting
upon.").

61.    To determine what constitutes an infringement, our sister
circuits have grappled with varying sliding-scale and tiered-
scrutiny approaches, agreeing as a general matter that "the
level of scrutiny applied to gun control regulations depends on
the regulation's burden on the Second Amendment right to keep
and bear arms." *Nordkye v. King*, 681 F.3d 1041, 1045–46 (9th
Cir. 2012) (en banc)(O'Scannlain, J., concurring) (collecting
cases); *see Heller II*, 670 F.3d at 1257(requiring a "strong
justification" for regulations imposing a "substantial burden
upon the core right of self-defense"); *Ezell*, 651 F.3d at 706,
708 (applying more demanding scrutiny to "severe burden[s] on
the core Second Amendment right"); *Masciandaro*, 638 F.3d at 469–
70 (requiring "strong justification[s]" for "severe burden[s] on
the core Second Amendment right" (quoting *Chester*, 628 F.3d at
682–83)); *Marzzarella*, 614 F.3d at 97 (calibrating the level of
scrutiny to the "severity" of the burden imposed). Under this

general approach, severe restrictions on the "core" right have been thought to trigger a kind of strict scrutiny,

62. A law effecting a *destruction of the right*" rather than merely *burdening* it is, after all, an infringement under any light. *Heller*, 554 U.S. at 629 (emphasis added) (quoting *Reid*, 1 Ala. at 616-17); *see also Heller II*, 670 F.3d at 1271 ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny.").

63. Intermediate scrutiny is not appropriate, however, for cases involving the destruction of a right at the core of the Second Amendment.

64. Because the Second Amendment "confer[s] an individual right to keep and bear arms," we must assess whether the California scheme deprives any individual of his constitutional rights. *Heller*, 554 U.S. at 595. Thus, the question is not whether the California scheme (in light of San Diego County's policy) allows *some* people to bear arms outside the home in *some* places at *some* times; instead, the question is whether it allows the typical responsible, law-abiding citizen to bear arms in public for the lawful purpose of self-defense. The answer to the latter question is a resounding "no."

65. the Second Amendment does require that the states permit *some form* of carry for self-defense outside the home.

66.    But so far as it cuts off the exercise of the right of the citizen altogether to *bear arms*, *or*, under the color of prescribing the *mode*, renders the right itself useless—it is in conflict with the Constitution, and *void*." 1 Ga. at 243.

67.    We are unpersuaded by the decisions of the Second, Third, and Fourth Circuits for several reasons. First, contrary to the approach in *Heller*, all three courts declined to undertake a complete historical analysis of the scope and nature of the Second Amendment right outside the home…. Amendment"). As a result, they misapprehend both the nature of the Second Amendment right and the implications of state laws that prevent the vast majority of responsible, law-abiding citizens from carrying in public for lawful self-defense purposes.

68.    And with these cases off the table, the remaining cases speak with one voice: states may not destroy the right to bear arms in public under the guise of regulating it.

69.    By evading an in-depth analysis of history and tradition, the Second, Third, and Fourth Circuits missed a crucial piece of the Second Amendment analysis. They failed to comprehend that carrying weapons in public for the lawful purpose of self defense is a central component of the right to bear arms.

70.    regulations on the right, although permissible to an extent, could not go so far as to enjoin completely a responsible, law-abiding citizen's right to carry in public for self-defense. Such regulations affecting a destruction of the

right to *bear arms*, just like regulations that affect a destruction of the right to *keep arms*, cannot be sustained under any standard of scrutiny

71.     Because the Second, Third, and Fourth Circuits eschewed history and tradition in their analysis of the constitutionality of these regulations, despite the Supreme Court's admonition that "the public understanding of a legal text in the period after its enactment or ratification" is a "critical tool of constitutional interpretation," we find their approaches unpersuasive.

72.     the analysis in the Second, Third, and Fourth Circuit decisions is near-identical to the freestanding "interest-balancing inquiry" that Justice Breyer proposed—and that the majority explicitly rejected—in *Heller*....As we previously explained, such an approach ignores the *Heller* court's admonition that "the very enumeration of the right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon."

73.     it is not the role of this Court [or ours] to pronounce the Second Amendment extinct." *Id.* at 636. Nor may we relegate the bearing of arms to a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees that we have held to be incorporated into the Due Process Clause."

74. San Diego County's "good cause" permitting requirement impermissibly infringes on the Second Amendment right to bear arms in lawful self-defense.

75. Yolo County's policy...abridges the Second Amendment right to bear arms because its definition of "good cause" prevents a responsible, law-abiding citizen from carrying a handgun in public for the lawful purpose of self-defense.

## RHONDA EZELL, ET. AL. v. CITY OF CHICAGO
## United States Court Of Appeals,Seventh Circuit

76. This reasoning assumes that the harm to a constitutional right is measured by the extent to which it can be exercised in another jurisdiction. That's a profoundly mistaken assumption. In the First Amendment context, the Supreme Court long ago made it clear that " 'one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.' " Schad v. Borough of Mt. Ephraim, 452 U.S. 61, 76-77, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) (quoting Schneider v. State of New Jersey, 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939)). The same principle applies here. It's hard to imagine anyone suggesting that Chicago may prohibit the exercise of a free speech or religious-liberty right within its borders on the rationale that those rights may be freely enjoyed in the suburbs. That sort of argument should be no less unimaginable in the Second Amendment context.

77. Beyond this crucial point about the form of the claim, for some kinds of constitutional violations, irreparable harm is presumed. See 11A Charles Alan Wright et al., Federal Practice & Procedure § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). This is particularly true in First Amendment claims. See, e.g., Christian Legal Soc'y, 453 F.3d at 867 ("[V]iolations of First Amendment rights are presumed to constitute irreparable injuries "(citing Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976))). The loss of a First Amendment right is frequently presumed to cause irreparable harm based on "the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." Miles Christi Religious Order v. Twp. of Northville, 629 F.3d 533, 548 (6th Cir.2010) (internal alteration and quotation marks omitted); see also KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1272 (11th Cir.2006). The Second Amendment protects similarly intangible and unquantifiable interests. Heller held that the Amendment's central component is the right to possess firearms for protection. 554 U.S. at 592-95. Infringements of this right cannot be compensated by damages.

78.    Heller, McDonald, and a framework for Second Amendment
litigation….. Heller focused almost exclusively on the original
public meaning of the Second Amendment, consulting the text and
relevant historical materials to determine how the Amendment was
understood at the time of ratification. This inquiry led the
Court to conclude that the Second Amendment secures a pre-
existing natural right to keep and bear arms; that the right is
personal and not limited to militia service; and that the
"central component of the right" is the right of armed self-
defense, most notably in the home.

79.    we know that Heller's reference to "any standard of
scrutiny" means any heightened standard of scrutiny; the Court
specifically excluded rational-basis review. Id. at 628–29 & n.
27 ("If all that was required to overcome the right to keep and
bear arms was a rational basis, the Second Amendment would be
redundant with the separate constitutional prohibitions on
irrational laws, and would have no effect."); see also Skoien,
614 F.3d at 641 ("If a rational basis were enough [to justify a
firearms law], the Second Amendment would not do anything
because a rational basis is essential for legislation in
general.")

80.    "The scope of the Second Amendment right" is determined by
textual and historical inquiry, not interest-balancing.).

81.    The Supreme Court's free-speech jurisprudence contains a
parallel for this kind of threshold "scope" inquiry. The Court

has long recognized that certain "well-defined and narrowly limited classes of speech"—e.g., obscenity, defamation, fraud, incitement—are categorically "outside the reach" of the First Amendment. United States v. Stevens, U.S. , 130 S.Ct. 1577, 1584-85, 176 L.Ed.2d 435 (2010); see also Brown v. Entm't Merchants Ass'n, No. 08-1448,2011 WL 2518809, at *3-4 (June 27, 2011). When the Court has "identified categories of speech as fully outside the protection of the First Amendment, it has not been on the basis of a simple cost-benefit analysis." Stevens, 130 S.Ct. at 1586. Instead, some categories of speech are unprotected as a matter of history and legal tradition. Id. So too with the Second Amendment.

82.    the rigor of this judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right.

83.    Both Heller and McDonald suggest that broadly prohibitory laws restricting the core Second Amendment right—like the handgun bans at issue in those cases, which prohibited handgun possession even in the home—are categorically unconstitutional. Heller, 554 U.S. at 628-35 ("We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach."); McDonald, 130 S.Ct. at 3047-48.

84.    Both Heller and McDonald suggest that First Amendment analogues are more appropriate, see Heller, 554 U.S. at 582,

595, 635; McDonald, 130 S.Ct. at 3045, and on the strength of
that suggestion, we and other circuits have already begun to
adapt First Amendment doctrine to the Second Amendment context,
see Skoien, 614 F.3d at 641; id. at 649 (Sykes, J., dissenting);
Chester, 628 F.3d at 682; Marzzarella, 614 F.3d at 89 n. 4; see
also Volokh, Implementing the Right to Keep and Bear Arms for
Self-Defense, 56 UCLA L.Rev. at 1449, 1452, 1454-55; Lund, The
Second Amendment, Heller, and Originalist Jurisprudence, 56 UCLA
L.Rev. at 1376; Winkler, Heller's Catch-22, 56 UCLA L.Rev. at
1572.

85.     In free-speech cases, the applicable standard of judicial
review depends on the nature and degree of the governmental
burden on the First Amendment right and sometimes also on the
specific iteration of the right…. laws imposing severe burdens
get strict scrutiny

86.     We can distill this First Amendment doctrine and
extrapolate a few general principles to the Second Amendment
context. First, a severe burden on the core Second Amendment
right of armed self-defense will require an extremely strong
public-interest justification and a close fit between the
government's means and its end.

87.     The City must establish a close fit between the range ban
and the actual public interests it serves, and also that the
public's interests are strong enough to justify so substantial
an encumbrance on individual Second Amendment rights. Stated

differently, the City must demonstrate that civilian target practice at a firing range creates such genuine and serious risks to public safety that prohibiting range training throughout the city is justified.

88.     At this stage of the proceedings, the City has not come close to satisfying this standard. In the district court, the City presented no data or expert opinion to support the range ban, so we have no way to evaluate the seriousness of its claimed public-safety concerns. Indeed, on this record those concerns are entirely speculative

89.     The City maintains that firing ranges create the risk of accidental death or injury and attract thieves wanting to steal firearms. But it produced no evidence to establish that these are realistic concerns, much less that they warrant a total prohibition on firing ranges. In the First Amendment context, the government must supply actual, reliable evidence to justify restricting protected expression based on secondary public-safety effects.

## CHRISTOPHER M. FLETCHER ET. AL. v. ROBERT C. HAAS Et.Al. U. S. DISTRICT COURT DISTRICT OF MA

90.     As the Fourth Circuit has explained: The Second Amendment is no more susceptible to a one-size-fits-all standard of review than any other constitutional right. Gun-control regulations impose varying degrees of burden on Second Amendment rights, and individual assertions of the right will come in many forms. A

severe burden on the core Second Amendment right of armed self-defense should require strong justification.

91.    Nevertheless, *Heller* expressly ruled out applying rational basis review to laws encroaching upon the Second Amendment right to bear arms. 554 U.S. at 628 n.27.

92.    Nevertheless, it has been recognized that "any law that would burden the 'fundamental,' core right of self-defense in the *home* by a *law-abiding* citizen would be subject to strict scrutiny." *Masciandro*, 638 F.3d at 470 (emphasis added).

93.    The threshold inquiry is whether the absolute prohibition on handgun possession by Fletcher and Pryal, who are lawful permanent residents, falls within the scope of the Second Amendment.

94.    The Massachusetts firearms regulatory regime, as applied to Fletcher and Pryal, does not pass constitutional muster

95.    Defendants argue that Massachusetts has a compelling interest in limiting the proliferation of firearms because of their inherent danger. But Defendants fail to establish that the statute is either substantially related to, or narrowly tailored to serve, this interest in a constitutional fashion.

96.    The possibility that some resident aliens are unsuited to possess a handgun does not justify a wholesale ban.

## MCDONALD ET AL. *v.* CITY OF CHICAGO, ILLINOIS, ET AL.
## SUPREME COURT OF THE UNITED STATES

97.    In *Heller*, however, we expressly rejected the argument
that the scope of the Second Amendment right should be
determined by judicial interest balancing,

98.    *Heller* points unmistakably to the answer. Self-defense is
a basic right, recognized by many legal systems from ancient
times to the present, and the *Heller* Court held that individual
self-defense is "the central component" of the Second Amendment
right.

99.    It thus concluded that citizens must be permitted "to use
handguns for the core lawful purpose of self-defense." *Heller*
also clarifies that this right is "deeply rooted in this
Nation's history and traditions,"

100.    In *Snyder* v. *Massachusetts*, 291 U. S. 97, 105 (1934), the
Court spoke of rights that are "so rooted in the traditions and
conscience of our people as to be ranked as fundamental." And in
*Palko*, the Court famously said that due process protects those
rights that are "the very essence of a scheme of ordered
liberty" and essential to "a fair and enlightened system of
justice." 302 U. S., at 325.

101.    In sum, it is clear that the Framers and ratifiers of the
Fourteenth Amendment counted the right to keep and bear arms
among those fundamental rights necessary to our system of
ordered liberty.

## WESSON ET. AL. v. TOWN OF SALISBURY ET. AL. U. S. DISTRICT COURT DISTRICT OF MASSACHUSETTS

102.    The Second Amendment, on the other hand, "codifies a 'right of the people'" as individuals "to possess and carry weapons in case of confrontation" in the defense of "hearth and home." Dist. of Columbia v. Heller, 554 U.S. 570, 579, 592, 599 (2008)

103.    In deciding that the right to bear arms is "fundamental to our scheme of ordered liberty" and is "deeply rooted in this Nation's history and tradition," Justice Alito found this to be especially true of handguns "because they are the 'the most preferred firearm in the nation . . . for protection of one's home and family.'" Id. at 3036 (HELLER & MCDONALD)

## CLIFFORD TYLER v. HILLSDALE COUNTY SHERIFF'S DEPT., U. S. APPEALS COURT FOR THE 6th CIRCUIT

104.    There are strong reasons for preferring strict scrutiny over intermediate scrutiny. First, the Supreme Court has by now been clear and emphatic that the "right to keep and bear arms" is a "fundamental right necessary to our system of ordered liberty." McDonald, 561 U.S. at 778. In our view, that strong language suggests that restrictions on that right trigger strict scrutiny.

105.    Although it is true that strict scrutiny is not always implicated when a fundamental right is at stake, the Supreme Court has suggested that there is a presumption in favor of strict scrutiny when a fundamental right is involved.

32

106. another reason for preferring strict scrutiny is that the courts of appeals originally adapted the levels of scrutiny of Second Amendment jurisprudence by looking to First Amendment doctrine.....First Amendment doctrine reflects a preference for strict scrutiny     Beyond the First Amendment context, the Court's substantive due-process doctrine also employs a form of strict scrutiny.

107. Third, strict scrutiny is preferable because this is a doctrinal area in which the Court has not simply refrained from suggesting that lesser review is called for but one in which it has strongly indicated that intermediate scrutiny should not be employed.

108. Fourth, and perhaps most importantly, we reject intermediate scrutiny here because it has no basis in the Constitution. Both the Court and the academy have said as much.

109. The Heller Court's reasons for explicitly rejecting rational-basis scrutiny apply equally to intermediate scrutiny. The Court rejected rational-basis scrutiny for Second Amendment challenges because it "is a mode of analysis we have used when evaluating laws under constitutional commands that are themselves prohibitions on irrational laws," citing Engquist v. Oregon Department of Agriculture, 553 U.S. 591 (2008), an employment-discrimination case under the Equal Protection Clause. Heller, 554 U.S. at 628 n.27 (emphasis added). "In those cases," the Court said, "'rational basis' is not just the

33

standard of scrutiny, but the very substance of the constitutional guarantee." Ibid. (emphasis added). "Obviously, the same test"—i.e., a scrutiny test imported from Equal Protection Clause jurisprudence—"could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms." Ibid. (emphasis added). The Court continued: "There may be narrower scope for operation of the presumption of constitutionality [i.e., narrower than that provided by rational basis review] when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten amendments . . . ." Ibid. (quoting United States v. Carolene Prods. Co., 304 U.S. 144, 152 n.4 (1938)) (bracketed material from Heller). Heller's footnote 27—even aside from the Court's flat rejection of Justice Breyer's interest-balancing inquiry—strongly suggests that intermediate scrutiny "could not be used to evaluate" Second Amendment challenges. Ibid.

110.    Given the above, we prefer strict scrutiny over intermediate scrutiny..... strict scrutiny.....is more appropriate for assessing a challenge to an enumerated constitutional right, especially in light of Heller's rejection of judicial interest-balancing. See Chovan, 735 F.3d at 1145—46, 1149—52 (Bea, J., concurring) ("Categorical curtailment of

constitutional rights based on an individual's status requires more rigorous analysis than intermediate scrutiny."); NRA v. ATF (NRA II), 714 F.3d 334, 336 (5th Cir. 2013) ("[T]he level of scrutiny required [for the case] must be higher than [intermediate scrutiny]."); Heller II, 670 F.3d at 1284 ("Even if it were appropriate to apply one of the levels of scrutiny after Heller, surely it would be strict scrutiny rather than . . . intermediate scrutiny

111.    Strict scrutiny demands government interests that are "compelling" and not "merely" "important." ......it demands that government regulations be "narrowly tailored" to the interests and not "merely" "substantially related" to those interests.

112.    a regulation flunks the narrow-tailoring requirement by being "under inclusive" if "the proffered objectives are not pursued with respect to analogous . . . conduct."

113.    To be eligible for any grant money, however, Congress required states to implement a relief-from-disabilities-program for individuals subject to § 922(g)(4)'s prohibition. See § 103(c), 122 Stat. at 2568. States "shall grant the relief" and restore the individual's firearm rights if the person is unlikely to be dangerous. Tyler could apply for relief from a federally-certified state program, but he cannot obtain relief from his state program because Michigan has not created one. If Michigan had a program, Tyler could potentially obtain relief

and regain his Second Amendment right because he is not
dangerous.

114.     Under this scheme, whether Tyler may exercise his right
to bear arms depends on whether his state of residence has
chosen to accept the carrot of federal grant money and has
implemented a relief program. His right thus would turn on
whether his state has taken Congress's inducement to cooperate
with federal authorities in order to avoid losing anti-crime
funding. An individual's ability to exercise a "fundamental
right necessary to our system of ordered liberty," McDonald, 561
U.S. at 778, cannot turn on such a distinction.

116. "Our task is to apply the Constitution and the precedents
of the Supreme Court, regardless of whether the result is one we
agree with as a matter of first principles or policy." Heller
II, 670 F.3d at 1296 (Kavanaugh, J., dissenting).

## JAIME CAETANO v.MASSACHUSETTS
## SUPREME COURT OF THE UNITED STATES

115.     It is settled that the Second Amendment protects an
individual right to keep and bear arms that applies against both
the Federal Government and the States. That right vindicates the
"basic right" of "individual self-defense."

116.     the Second Amendment accordingly guarantees the right to
carry weapons "typically possessed by law-abiding citizens for
lawful purposes,"

117.    The lower court's ill treatment of *Heller* cannot stand.
The reasoning of the Massachusetts court poses a grave threat to
the fundamental right of self-defense. ...the right to bear
other weapons is "no answer" to a ban on the possession of
protected arms.

### KOLBE v. HOGAN
### UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

118.    Maryland law implicates the core protection of the Second
Amendment—"the right of law-abiding responsible citizens to use
arms in defense of hearth and home," District of Columbia v.
Heller, 554 U.S. 570, 635 (2008), and we are compelled by Heller
and McDonald v. City of Chicago, 561 U.S. 742 (2010), as well as
our own precedent in the wake of these decisions, to conclude
that the burden is substantial and strict scrutiny is the
applicable standard of review for Plaintiffs' Second Amendment
claim...We are not a rubber stamp. We require strict scrutiny
here not because it aligns with our personal policy preferences
but because we believe it is compelled by the law set out in
Heller and Chester.

119.    we fashioned a two-part approach to resolving Second
Amendment challenges, see 628 F.3d 673, 680 (4th Cir. 2010),
much like the approach adopted by several of our sister
circuits...First, we ask "whether the challenged law imposes a
burden on conduct falling within the scope of the Second

Amendment's guarantee"..."if the challenged regulation burdens
conduct that was within the scope of the Second Amendment as
historically understood, then we move to the second step of
applying an appropriate form of means-end scrutiny"... "any law
that would burden the 'fundamental,' core right of self-defense
in the home by a law-abiding citizen would be subject to strict
scrutiny.

120.   Heller affirmed that the Second Amendment protects a
preexisting "individual right to possess and carry weapons in
case of confrontation." 554 U.S. at 592. "Deeply rooted in this
Nation's history and tradition," McDonald, 561 U.S. at 768
(internal quotation marks omitted), this right is among the
"fundamental rights necessary to our system of ordered liberty,"
id. at 778. The right to keep and bear arms historically has
been understood to encompass "self-defense and hunting," Heller,
554 U.S. at 599, but Heller made clear "the central component of
the Second Amendment right" is "individual self-defense,"
McDonald, 561 U.S. at 767.

121.   The Supreme Court has already performed an historical
analysis of our traditional understanding of a citizen's right
to keep a weapon at home for self-defense, concluding that "the
right of law-abiding, responsible citizens to use arms in
defense of hearth and home" lies at the core of the Second
Amendment. Heller, 554 U.S. at 635. Any prohibition or

restriction imposed by the government on the exercise of this right in the home clearly implicates conduct protected by the Second Amendment.

122. The strict-scrutiny standard requires the government to prove its restriction is "narrowly tailored to achieve a compelling governmental interest"...To be narrowly tailored, the law must employ the least restrictive means to achieve the compelling government interest.

123. In Chester, we adopted a First-Amendment-like approach to determining the appropriate level of scrutiny to apply to any given Second Amendment challenge.

124. "Nothing in our decision in Heller suggested that a law must rise to the level of the absolute prohibition at issue in that case to constitute a 'substantial burden' on the core of the Second Amendment right.").

125. "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed.")

126. "The right to self-defense is largely meaningless if it does not include the right to choose the most effective means of defending oneself." Friedman, 784 F.3d at 418 (Manion, J., dissenting); see id. at 413 ("The ultimate decision for what constitutes the most effective means of defending one's home,

family, and property resides in individual citizens and not the government.

127. The Equal Protection Clause guarantees that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.13...the Equal Protection Clause is designed to "keep governmental decision makers from treating differently persons who are in all relevant respects alike." Nordlinger v. Hahn, 505 U.S. 1, 10 (1992).

## RADICH v. GUERRERO & LARSON UNITED STATES DISTRICT COURT FOR THE NORTHERN MARIANA ISLANDS

128. The Second Amendment, made applicable against the states through the Fourteenth Amendment, protects the fundamental right of armed self-defense... The Equal Protection Clause prohibits discrimination against suspect classes of individuals, including lawful permanent residents, without a legitimate state interest as justification.

129. ...a government's authority to act is limited by its duty not to violate individual rights... The reason is obvious: if individual rights were not a check on government power, then they would serve no purpose, an absurd outcome. *See McDonald*, 561 U.S. at 769 (noting that the framers of the U.S. Constitution and their opponents both agreed that the "right to bear arms was fundamental to the newly formed system of

government," but that "those who were fearful that the new
Federal Government would infringe traditional rights such as the
right to keep and bear arms insisted on the adoption of the Bill
of Rights as a condition for ratification of the Constitution");
*see Garcia v. San Antonio Metropolitan Transit Authority*, 469
U.S. 528, 569 (1985) (Powell, J., dissenting) ("So strong was
the concern that the proposed Constitution was seriously
defective without a specific bill of rights . . . that in order
to secure the votes for ratification, the Federalists eventually
conceded that such provisions were necessary.")

ADDITIONAL INFORMATION CONCERNING PAGE 3 PARAGRAPH 9

130.    In several cases, similar in that whether an applicant
received a LTC or not was solely determined by venue,(In both
RICHMOND v. PERAINO and WESSON ET. AL. v. TOWN OF SALISBURY(U.S.
DISTRICT COURT DISTRICT OF MA)) "the Commonwealth acknowledged
that it could not argue that the disqualification was
"'substantially related' to an interest in preserving public
safety and preventing crime"".

131.    RICHMOND v. PERAINO: ...the First Circuit has held that
"a categorical ban on gun ownership by a class of individuals
must be supported by some form of 'strong showing,'
necessitating a substantial relationship between the restriction
and an important governmental objective."

41

132.   Accordingly, in Wesson, the Commonwealth conceded that
had the plaintiffs been convicted in Massachusetts of simple
possession of an ounce or less of marijuana, rather than having
been convicted of that offense outside of the Commonwealth, they
would in all likelihood not have been subject to the statutory
exclusion from obtaining an LTC or PTP. Because other
individuals who had substantially identical convictions could
otherwise be considered for and receive an LTC, the Commonwealth
acknowledged that it could not argue that the disqualification
was "'substantially related' to an interest in preserving public
safety and preventing crime" and thus "d[id] not oppose a
narrowly drawn declaratory judgment" that the statutory
exclusions contained in ch. 140, §§ 131(d)(i)(E) and 131A
infringed on the plaintiffs' "Second Amendment right to possess
firearms in the home for self-defense."

90.9wbur

# In Mass., Gun Permit Standards Vary By Location

By Fred Bever   March 4, 2014

### Varied Standards

133.   David Martineau, deputy chief at the police department in the small town of
Avon, says there are some basics to getting an unrestricted Class A gun license in his
community: You must complete a certified gun safety course, pay a $100 fee, provide
fingerprints and submit two letters of reference attesting to your suitability to own
firearms.

**134.** "Just that you're a standup guy and they have no reservations about you having a gun," Martineau explained.

**135.** An unrestricted Class A license is the broadest of three types available under state law. It allows a resident to have rifles, shotguns and large-capacity handguns.

**136.** State and federal law can bar firearm ownership on several grounds. Those exclusions include, for instance, any conviction on charges that carry maximum penalties of two years or more, or an involuntary commitment to a mental institution.

**137.** But other than the specific statutory prohibitions, Martineau says, determination of an Avon resident's suitability to own a handgun is really his call.

**138.** "I'm pretty lenient," he said. "I figure statutorily if you're allowed to have it, who am I?"

**139.** But if there are doubts about someone's history, licensing authorities such as Martineau may consult arresting officers, victims, family and friends.

**140.** Deputy Chief Martineau may be lenient as a matter of course, but some of his colleagues are not. Some police departments don't make any checks beyond the statutory exclusions. In others, they won't even consider an unrestricted license for a first-time gun owner.

### ADDITIONAL INFORMATION CONCERNING PAGE 4 PARAGRAPH 10

141.   Davis v. Grimes (U.S. DISTRICT COURT DISTRICT OF MA) challenged the wide-spread practice of restricting the lawful possession, use, and carrying of firearms in such a way as to deny plaintiffs the ability to use or carry a firearm for personal protection.

142.   The lawsuit sought a declaratory ruling that the Massachusetts statute and the practice of the defendants is unconstitutional as it denies otherwise qualified citizens the ability possess or carry an operable firearm for the purpose of personal protection.

143.    Both defendant's, Peabody and Weymouth, have changed their licensing policies and now routinely issue unrestricted class A licenses to carry to qualified applicants.

144.    From the court's order: *In accordance with the Court's Electronic Order issued on June 17, 2015, granting the defendant's Motion to Dismiss on the Ground That There is no Longer a Case or Controversy Between the Parties, it is hereby ORDERED that the above-entitled action be dismissed.*

## EXHIBITS SECTION



**Commonwealth of Massachusetts**

Class A Large Capacity
License to Carry Firearms (M.G.L. c. 140, § 131)

License Number: 12834391A
Date of Issue: 08/08/2005
Expiration Date: 08/28/2011

Issuing City/Town: BRIDGEWATER
Restrictions: All Lawful Purposes

BROWN, LAURENCE A
20 VIRGINIA DRIVE
BRIDGEWATER, MA 02324



**U. S. Department of Justice**

Federal Bureau of Investigation

Clarksburg, WV 26306

June 25, 2008

Mr. Laurence Allen Brown
20 Virginia Drive
Bridgewater, MA 02324

         SUBJECT: National Instant Criminal Background
                  Check System (NICS) Voluntary Appeal File (VAF)
                  Unique Personal Identification
                  Number (UPIN)-**V0001241**

Dear Mr. Brown:

        The Appeal Services Team (AST) of the FBI Criminal Justice
Information Services (CJIS) Division's NICS Section has processed your
application and has made a determination regarding the status of your
application. The fingerprints you submitted are identical with a
record that we maintain in our database. Based on further review and
investigation, we have been able to verify that <u>you are eligible to
be placed in the VAF</u>.

        You are advised that entry into the VAF will not
automatically result in a proceed response on subsequent firearm
purchases. A complete NICS check will be required on each
transaction and may result in a denied status, if prohibitive
information is discovered.

        You have been issued a UPIN which will identify you as a
person who has been entered into the VAF and whose criminal
history contains no firearm prohibitions. Keep this original
letter in a secure location. You will need to provide your
assigned UPIN to the Federal Firearms Licensee (FFL) for each
subsequent firearm transaction.

        In the future, if you decide that you no longer wish to
have your information retained in the VAF, you may submit a
written request to the AST to be removed from the VAF. Upon
receipt of your written request, your information will be
destroyed and you will receive written confirmation. Additionally,
your original fingerprint card will be returned.

Mr. Laurence Allen Brown

Per the NICS Final Rule, Title 28, Code of Federal Regulations, Part 25.10(g), if the NICS Section discovers disqualifying information, the NICS Section may delete your information from the VAF. You will be notified by mail if this situation ever occurs.

For subsequent NICS checks, the FFL must contact the NICS Call Center at 1-877-324-6427. The FFL must advise the Call Center Representative that they need to initiate a background check with a UPIN.

If you have any questions regarding this communication, you may contact the NICS Section Customer Service at 1-877-444-6427.

                              NICS Section
                              CJIS Division



# THE COMMONWEALTH OF MASSACHUSETTS
## EXECUTIVE OFFICE OF PUBLIC SAFETY AND SECURITY
### *Department of Criminal Justice Information Services*

*200 ARLINGTON STREET, SUITE 2200*
*CHELSEA, MASSACHUSETTS 02150*
*WWW.MASS.GOV/CHSB*

**Deval L. Patrick**
Governor

**Timothy P. Murray**
Lieutenant Governor

**Mary Elizabeth Heffernan**
Secretary of
Public Safety and Security

**James F. Slater, III**
Acting Commissioner

To whom it may concern:

A computerized search has been made of the database of the Department of Criminal Justice Information Services, which is the repository for criminal records in the Commonwealth of Massachusetts, for BROWN, LAURENCE, date-of-birth 05/26/47 and have determined that he or she has no adult criminal court appearances.

Signed under the pains and penalties of perjury this Twenty-Eighth day of November, 2011.

_____
Criminal Justice Information Services

Suffolk, ss.
_____
County

On this 28 day of November, 20 11, before me, the undersigned notary public, personally appeared
ADDMA MARQUE (name of document signer), proved to me through satisfactory evidence
of identification, which were MA LICENSE to be the person who signed the preceding or
attached document in my presence, and who swore or affirmed to me that the contents of the document
are truthful and accurate to the best of (his)(her) knowledge and belief.

Dated: 11/28/2011

_____
Notary Public

My commission expires          February 13, 2015

THE COMMONWEALTH'S PROVIDER OF CRIMINAL JUSTICE INFORMATION SERVICES
TEL: 617-660-4600 • TTY: 617-660-4606 • FAX: 617-660-4613

47



Commonwealth of Massachusetts -- Department of Criminal Justice Information Services

No record found in Court Activity Record Information file on CJIS for:

Name:          BROWN, LAURENCE
DOB:           05/26/47
Today's date:  11/28/2011
Today's time:  13:37

This indicates that there is no record in the Massachusetts Probation Central File Automated Database for this name and date of birth pursuant to your request.

Please check that the name referenced above matches the name and date of birth of the person whose record you requested. IT IS YOUR RESPONSIBILITY TO ENSURE THAT THE RESPONSE CORRESPONDS WITH THE REQUEST. If there is a discrepancy please contact the CORI Unit at (617)660-4640.

Requested by:   PERSN
Completed by:   ##CORI-MFL  0314-MFL

# Relief

Delmonte's case by case discretionary decision not to renew my class A license to carry does not merely burden my Second Amendment rights, it completely destroys them. *"A law that under the pretence of regulating, amounts to a destruction of the right would not pass constitutional muster under any of the standards of scrutiny that we have applied to enumerated constitutional rights. A law effecting a destruction of the right rather than merely burdening it is, after all, an infringement under any light.*"(HELLER & PERUTA)

Additionally, the Supreme Court in Heller clearly prohibited the practice of case-by-case discretionary licensing decisions: *"We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad."*

The Supreme Court stated that Second Amendment cases should be handled just like First Amendment cases. Therefore, please consider what your reaction would be if Massachusetts had discretionary case by case statutes governing freedom of speech. What if in Massachusetts your local police chief was the individual empowered to decide which citizens were able to benefit from their First Amendment right to freedom of speech and how much of that right they would be able to exercise? I bet this Honorable Court could rule that scenario unconstitutional without difficulty.

Therefore, the Plaintiff requests that this Honorable Court find that Massachusetts' case by case discretionary firearms licensing laws are unconstitutional under the Second Amendment and, also, possibly the Fourteenth Amendment.

The Plaintiff requests that this Honorable Court find that the Second Amendment defines a right, not a privilege, and that police chiefs do not hand out enumerated Constitutional rights.


Respectfully Submitted,


_Laurence Brown_

Laurence Brown, Plaintiff, Pro Se        5/10/16
20 Virginia Dr.
Bridgewater, MA 02324
508 697 4195
oursite1@hotmail.com